Peter R. Ehrhardt, Esquire
LAW OFFICE OF PETER R. EHRHARDT
Attorney for Plaintiffs
215 Fidalgo Ave., Suite 201
Kenai, AK 99611
Phone: (907) 283-2876
Fax:    (907) 283-2896
peter@mail.kenailaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| **South Peninsula Hospital,** ) | |
| **Alaska Speech and Language Clinic, Inc.,** ) | |
| **and Kenai Vision Center, LLC,** ) | |
| **on behalf of themselves and others** ) | |
| **similarly situated** ) | **CASE NO.:** |
| **, Plaintiffs** ) | |
| ) | |
| **v.** ) | |
| ) | **CLASS ACTION COMPLAINT** |
| **Xerox State Healthcare, LLC** ) | |
| **Defendant** ) | **JURY TRIAL DEMANDED** |
| _____) | |

PLAINTIFFS, on behalf of themselves and others similarly situated, allege, upon

personal knowledge as to facts pertaining to themselves and upon information and belief as to facts

and conduct of others, as follows:

I.      **INTRODUCTION.**

1.      On October 1, 2013, the State of Alaska ("Alaska") implemented a new Medicaid

Management Information System ("MMIS"), which was intended to manage enrollments for

providers of Medicaid-covered services and reimbursement payments to healthcare providers

entitled to such reimbursement. Alaska's MMIS pays about $1.5 billion annually to over 22,000 healthcare providers in Alaska.

2.    Defendant, Xerox State Healthcare, LLC ("Xerox"), formerly known as ACS State Healthcare, LLC, entered into a contract in 2007 to develop a new MMIS for Alaska. Alaska's healthcare providers, who would receive reimbursements for services rendered through the MMIS, were intended third-party beneficiaries of this contract. The existing system, which had been implemented in 1987, was outdated and out of compliance with existing federal regulations. The contract originally specified that the new MMIS be implemented by May 31, 2010.

3.    After many delays, Xerox represented to Alaska and to healthcare providers that the new MMIS was ready to "go live" on October 1, 2013. Accordingly, software used by healthcare providers was connected to the new MMIS on that date.

4.    As had been known by Xerox, the MMIS was not ready to go live on October 1, 2013. The MMIS was unable to accept new, legitimate claims on that date. All, or substantially all, claims submitted were rejected by Xerox for the first several months of implementation. These rejections, which were caused by Xerox's defective MMIS, cost the healthcare providers of Alaska hundreds of millions of dollars:

•    The providers were deprived of regular reimbursements for many months, and had to fund operations from other sources or go out of business.

•    The need to resubmit improperly rejected claims required healthcare providers to incur labor costs of clerical time. Some larger providers hired additional staff, while others paid overtime to existing employees, to the detriment of other parts of their medical businesses.

- Applicable Medicaid regulations require that all claims be submitted by providers within one year of the date of service. However, submissions, even if done properly, were not considered to be properly submitted if they were rejected by the defective MMIS rolled out by Xerox on October 1, 2013. Claims repeatedly rejected were ultimately deemed untimely and ineligible for any reimbursement from Medicaid.

5.     The losses suffered by Medicaid healthcare providers were a foreseeable consequence of Xerox's failures, first, in failing to produce properly functioning software by October 1, 2013; second, in misrepresenting to the State of Alaska that their system was ready to go live when it was not; and third, when Xerox failed to resolve in a timely manner the issues that arose upon implementation beginning in October 2013. These losses were suffered by the Medicaid healthcare providers who were known by Xerox.

II.     **PARTIES.**

    A.     **Plaintiffs.**

6.     South Peninsula Hospital ("South Peninsula") is a non-profit Critical Access Hospital in Homer, Alaska. It has 22 hospital beds and 28 nursing home beds, and approximately 350 employees. It bills over $16 million to Medicaid annually. It is incorporated under the laws of Alaska.

7.     Alaska Speech and Language Clinic, Inc. ("Alaska Speech") is a speech and language pathology provider in Kenai, Alaska. It billed $14,160 to Medicaid between October, 2013 and early 2014. It is incorporated under the laws of Alaska.

8.     Kenai Vision Center, LLC, ("Kenai") is an optometry business located in Kenai, Alaska. In 2013 and 2014, it employed two optometrists and several staff members. It billed

approximately $150,000 per year to Medicaid, representing about 10% of its revenue. It is organized under the laws of Alaska.

### B. Defendant.

9.      Defendant, Xerox Healthcare Solutions, LLC, is a limited liability corporation based in Atlanta, Georgia, and incorporated in Delaware. It is the successor to ACS State Healthcare, LLC, which entered into a contract to create a new MMIS with the Alaska Department of Health and Social Services. Xerox has an office in this District at 1835 Bragan Street, Anchorage, Alaska 99508. It is a subsidiary of Xerox Corporation.

### III.     JURISDICTON AND VENUE.

10.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), as the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and Class Representatives and most members of the Class are citizens of Alaska, and Defendant is not a citizen of Alaska. Plaintiff Class consists of greater than 100 members.

11.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this District.

12.      Defendant is subject to personal jurisdiction in this District because it has continuous and systematic contacts, including an office staffed with employees, within this District in Anchorage.

### IV.     FACTS.

13.      In November, 2006, the Alaska Department of Health and Human Services ("DHSS") issued a Request for Proposals ("RFP") to replace the existing MMIS. The RFP required

Case 3:15-cv-00177-TMB   Document 1   Filed 09/24/15   Page 4 of 22

that a new system meet state and federal standards to permit timely processing of Medicaid claims from healthcare providers, and to provide prompt payment of authorized claims.

14.     The RFP made clear that the one purpose of the contract was to benefit healthcare providers.  For example, the RFP § 5.6.9 stated:

> The Claims Payment function includes those functions necessary to ensure that payments to providers are accurately and appropriately rendered.

15.     Similarly, § 5.6.9.3.2, subtitled "Contractor Responsibilities – Weekly Checkwrite Processing," requires that the MMIS:

> (1) Generate payment amounts and process payments made through reimbursable service agreements (RSAs).  Make payments to other programs without issuing EFT transactions or hard copy warrants.
> (2) Process a payment cycle no less than weekly that includes processing of all claims and financial transactions.
>
> . . .

16.     § 5.6.9.3.4, "Contractor Responsibility – EFT Processing," required that the MMIS:

> (1) Produce electronic fund transfer payments for those providers requesting EFT . . .

17.     In 2007, DHSS awarded the contract to design, develop, implement and operate the new MMIS to Defendant, which at that time was known as ACS State Healthcare, LLC.  At that time, the contract required that the new MMIS be fully implemented by June 1, 2010.

18.     Xerox was aware at the time it entered this contract, and at all subsequent times, that one purpose of the contract was to permit healthcare providers in Alaska to receive reimbursement from Medicaid.  Conversely, it was aware that a failure to deliver a properly functioning produce would injure the affected healthcare providers by, *inter alia*, depriving them of money they had earned.

5

19.     The contract made clear that Xerox was required to meet an appropriate standard of care in its work on the contract:

> **C.3     Standard of Care**
>
> When providing Deliverables and performing Services pursuant to this Agreement, the Contractor shall, and shall cause the Contractor Agents to, provide such Deliverables and perform such Services in a professional manner and in a way that meets or exceeds the Contractor Standard of Care. As used herein, the term "**Contractor Standard of Care**" means the exercise of degree of skill, diligence and prudence which is expected from a skilled, experienced and nationally recognized and reputed contractor engaged in the same type of undertaking under similar circumstances and acting generally in accordance with applicable laws, rules, regulations, codes and industry standards.

20.     These provisions of the RFP cited above and many others specifying the manner in which the MMIS would serve the needs of healthcare providers, were incorporated into the contract that Xerox signed.  *See* Contract § G.2.1:

> The contractor shall design, develop, integrate, install, test, deploy, maintain and operate the Alaska MMIS that will meet all the functional and operational requirements described in the RFP.

21.     Xerox did not meet the June 1, 2010 deadline.  By September 2013, after several contract modifications, the MMIS still was not ready to go live.  In testing DHSS conducted in September 2013, DHSS informed Xerox of 44 defects that it had found in the new MMIS.  Xerox provided false reassurances to DHSS that these defects that been fixed, or that workarounds had been implemented.  In September 2013, Xerox submitted a certification (known as "an operational readiness document") to DHHS stating that the MMIS was ready to be implemented.  In reliance on these representations, DHHS permitted Xerox to "go live" with significant portions of the new MMIS.

22.     The new MMIS "went live" on October 1, 2013.  From that date, electronic claims could be submitted only through that system and not through the previous MMIS.  There was no

6

opportunity for healthcare providers to receive Medicaid reimbursement by any other means other than through the Xerox developed and operated MMIS.

23.     Plaintiffs and other healthcare providers immediately became aware that the new MMIS was fundamentally flawed, and was not able to perform the functions required to facilitate payments to healthcare providers. Providers who submitted claims by direct computer input or by paper documentation found that few, if any, claims were being accepted and that they were not receiving reimbursements to which they were entitled. This caused immediate financial hardship for many providers. The impact on providers has continued to increase up to the present.

24.     An inspection of the Xerox mail room by Alaska in 2014 revealed that hundreds of thousands of claims submitted on paper, typically by smaller providers, were being held in stacks and had not been processed at all. Xerox responded to a complaint by the State by returning many of the claims to the providers, rather than processing them, exacerbating the delays and the financial damage experienced by the providers. This conduct breached Xerox's contractual obligations to Alaska, to the detriment of intended beneficiary healthcare providers.

25.     A significant amount of electronic claims were also, in effect, left in stacks unopened. The claims were categorized as "suspended," neither paid nor denied, for extended periods. The effect on providers was the same as with the unprocessed paper claims: reimbursements were not received, causing financial hardship.

26.     DHHS partly ameliorated certain financial hardships to providers by offering interest-free loans to providers. According to a Complaint filed by DHHS with the Alaska Department of Administration before the Commissioner of Administration (Contract 060706/RFP 2007-0600-6640), loans of over $160 million were extended to Alaska healthcare providers in late 2013 and 2014. The loans were to be repaid when the MMIS systems were fixed and the backlog

7

of claims were paid. For most healthcare providers, this has not yet happened. Those loans provided temporary compensation for the lost revenue from Medicaid, but did not reimburse any other expenses incurred by providers.

27.     Between October 2013 and early 2015, the rejection of valid claims by Xerox's MMIS required providers to resubmit each claim, a tedious process involving reposting data that had already been inputted into a computer or re-submitting previously submitted paper documentation. Unfortunately, re-inputting data or re-submitting previously submitted paper documentation takes significant time, and typically had to be done between 4 and 7 times before a legitimate claim was finally accepted. This increased the providers' costs for administrative support significantly. Some providers paid employees overtime, others hired additional staff and others reallocated personnel who had other responsibilities.

28.     In many cases, Medicaid claims submitted electronically were not even registered on the MMIS as having been received at all. This created a risk that the claim would never be paid at all, because applicable regulations permit reimbursement of claims only if they are received within one year of the date of service. Thus, healthcare providers had no choice but to resubmit these claims. In many situations, resubmitted claims were rejected as well. One dental practice has written off over $500,000 in claims that it was unable to submit within one year of the dates of service because of the MMIS failure.

A.     **The Class Representatives Experiences**.

1.     **South Peninsula Hospital**.

29.     South Peninsula, a not-for-profit corporation, is the principal hospital serving Homer and the surrounding region. It has been designated a Critical Access Hospital because it is a small hospital and the only provider of emergency services in its region. It has an annual budget

8

of about $58 million, and historically about twenty-eight percent (28%) of its revenue has come from Medicaid reimbursements.

30.     Prior to the 2013 conversion to the new MMIS, South Peninsula had submitted Medicaid claims electronically on a daily basis.  It would receive reimbursements on a weekly basis.  If any claims were found to be inadequately documented, the reasons they were not accepted would be listed in a document provided weekly to the Hospital, which is called a "remittance advice."  Any issues raised on the remittance advice would be addressed by the Hospital in a prompt refiling.  Typically, a weekly remittance advice would be about 50 pages.  In addition, prior to October 2013, it generally received payment on the vast majority of its submitted claims within 120 days.

31.     Beginning in October 2013, weekly remittance advice memos grew from 50 to 500 pages and virtually no claims were deemed to be acceptable in the first claim submission. Moreover, the remittance advice documents were unusable, often requesting additional information that was not legally required or did not exist.  Frequently, information about patients being treated at other hospitals in Alaska was erroneously included in the remittance advices sent to South Peninsula.

32.     In the first full year of MMIS operations, very few, if any, reimbursements were made to South Peninsula for MRI procedures.  Many other categories of claims were also delayed for many months.

33.     Additionally, after the new MMIS commenced operating, Medicaid began for no apparent reason "taking back" (by offsets to amounts due) claims funds that had been legitimately paid in 2010, 2011, 2012 and 2013, with no explanation.

9

34.     The only means of obtaining reimbursement for legitimate claims was to repeatedly resubmit these same claims.  Unfortunately, the resubmissions took time and money.  South Peninsula paid for 971 hours of overtime for clerical employees in the past two years in order to resubmit claims that in most cases had already been properly submitted for a cost of $46,371.  On average, each rejected claim required between 4 and 7 resubmissions before it would be accepted.

35.     In addition to overtime, employees of South Peninsula put in extra hours on the resubmission of Medicaid claims during their regular hours, limiting their ability to perform other necessary functions, such as billing to insurance companies for privately insured patients.  Two full-time employees who had previously had other duties were transferred to work on Medicaid submissions for total salary and benefit expenses of $108,000 in each of two years.

36.     The redeployment of staff also resulted in a decline in the ability to timely bill insurance companies, which led to an increase in accounts receivable over 120 days from $600,000 in October 2013 to over $1,200,000 two years later in commercial accounts.

37.     At least $1 million of Medicaid claims from 2013 and early 2014 have still not been accepted.

### 2.     Alaska Speech and Language Clinic, Inc.

38.     Alaska Speech is a speech and language pathology practice with a single provider.  Almost all of its business consisted of Medicaid-eligible clients.  Alaska Speech submitted claims for reimbursement on paper rather than through a computer system.  Prior to October 2013, it generally received payment within 60 days.

39.     Reimbursements stopped in October 2013.  Alaska Speech did not receive error codes, or any other communications from Xerox or Alaska.  After repeated requests to Xerox, Alaska Speech was told that many of its claims had been paid, when in fact they had not been.

10

Resolving these issues required a significant amount of administrative time for Alaska Speech's part-time office manager, costing Alaska Speech a significant amount of additional expense resulting from the defective MMIS.

40. Between October 2013, and January 2014, Alaska Speech submitted claims for over $14,000 in reimbursement. It received no payments until March 2014, although it did receive a loan from Alaska. Between March and May 2014, it began to receive partial payments from Medicaid.

41. Because of the absence of cash flow and the uncertainty of when Medicaid reimbursement would resume, Alaska Speech substantially curtailed its operations in 2014.

### 3. Kenai Vision Center, LLC

42. Kenai was, through the end of 2014, an optometric practice with two optometrists. It had submitted Medicaid claims electronically, through a claims processor, Healthfusion. In September, 2013, Kenai received a notification that the new MMIS would begin operation on October 1, 2013. Kenai's office manager had regularly accessed the MMIS to keep track of claims and accounts receivable.

43. On October 4, 2013, the office manager discovered that it was not possible to log into the MMIS. Attempts to address the problem with Xerox by telephone were unsuccessful. Only after three weeks did Kenai discover that the MMIS was accessible only through computers that used an older version of the Internet Explorer web browser – information which Xerox had not provided.

44. Kenai then was able to access "Explanation of Benefits" documents, and discovered that the documents were provided in an unreadable format. Dollar values listed for claims accepted and rejected could not be reconciled with invoices that had been submitted. It appeared that a

11

systematic rounding error resulted in Kenai receiving small amounts less than was proper on almost every claim.  An inexplicable return to reimbursement rates from a previous year for eyeglasses, caused a larger shortfall.  Virtually all payments were significantly delayed.  Kenai received less than $2,500 in payments between October 1 and December 2013, a period in which it submitted $33,000 in claims.  After payments totaling $18,302 were received on December 23 and 30, 2013, a shortfall of almost $15,000 remained, some of which has not yet been recovered.

45.    Throughout 2014, Xerox rejected all claims for eye examinations for Medicare-eligible patients on the basis that they should have been submitted to Medicare, not Medicaid.  This was a senseless requirement, since Medicare does not cover eye examinations and such claims are routinely, and correctly, rejected.  However, the requirement to submit to Medicare, and then submit to Medicaid only after being rejected, added months to the payment cycle.

46.    The MMIS failures required Kenai's office manager to spend over 200 hours troubleshooting in the last quarter of 2013, and required about two extra days of bookkeeping and account reconciliation work per month through the end of 2014.

47.    At this time, over $3,000 in claims for 2013 and 2014 have not yet been reimbursed.

## V.    **CLASS ACTION ALLEGATIONS.**

### A.    **Class Allegations**.

48.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), and (b)(3) and/or (b)(2) and/or (c)(4) on behalf of themselves and the following class defined as follows (the Class"):

> All healthcare providers participating in the Alaska Medicaid assistance program who were entitled to receive compensation for services provided by Medicaid between October 1, 2013 and the present, and were required to file repeatedly for payment of those claims because they had initially been rejected, suspended, or delayed in processing by the Xerox MMIS.

12

The following individuals are excluded from the Class: (1) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and its current or former employees, officers and directors; (2) persons who properly execute and file a timely request for exclusion from the Class; (3) the legal representatives, successors or assigns of any such excluded persons; and (4) persons whose claims against Defendant have been fully and finally adjudicated and/or released.

49.     Plaintiffs reserve the right to expand the Class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

50.     Plaintiffs limit the definition of the Class as required by the applicable statute of limitations and accrual of statute of limitations as determined by the Court.

51.     Plaintiffs and members of the Class were harmed by Defendant's acts in at least the following ways:

        a.     They expended time, for which they had to pay employees, resubmitting claims that had been erroneously rejected or not accepted by the MMIS;

        b.     They were deprived of timely reimbursements by the inordinate delays in reimbursement caused by the MMIS failures, which delay of revenues damaged their business; and

        c.     They were permanently deprived of reimbursement for services rendered in those cases where the MMIS refused to accept submissions and resubmissions beyond the one-year period from the date services were rendered, so that the claims became untimely. The deprivation of these revenues damaged their business.

**B.    Numerosity.**

52.    According to a schedule provided by the State of Alaska, approximately 22,000 healthcare providers were entitled to receive compensation from Medicaid for providing medical services, and were required to submit claims through the Xerox MMIS. Substantially all of them were injured by Xerox's conduct.

**C.    Commonality and Predominance.**

53.    There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class.

54.    Common questions for the Class include, but are not necessarily limited to, the following:

a.    Whether the Medicaid healthcare providers of Alaska constitute a foreseeable group of professional businesses to which Xerox owed a duty of care;

b.    Whether the MMIS developed by Xerox was defective;

c.    Whether the defective MMIS breached a duty of care Xerox owed to Alaska Medicaid healthcare providers;

d.    Whether Plaintiffs and other members of the proposed class are direct, intended third party beneficiaries of the contract entered into between Xerox and Alaska;

e.    Whether Xerox breached its contract with Alaska by providing and agreeing to "go live" with a defective MMIS on October 1, 2013;

f.    Whether Xerox misrepresented that the MMIS was operational as of October 1, 2013;

14

g.     Whether Xerox omitted material facts and or made affirmative misstatements in its representations regarding the usability of the MMIS in 2013;

h.     Whether Xerox's representations to DHSS with regard to the functionality of the MMIS constituted a deceptive and/or unfair act or practice;

i.     Whether the defects of the MMIS caused the business harms to Class Members as described in Paragraphs 23 - 28 above;

j.     Whether members of the Class are entitled to recover monetary damages caused by Xerox's actions; and

k.     Whether members of the Class are entitled to recover punitive damages as a result of Xerox's actions.

## D.     <u>Typicality</u>.

55.     Plaintiffs' claims are typical of the claims of the other members of the Class.

56.     Plaintiffs and the Class sustained damages as a result of Xerox's uniform wrongful conduct during transactions with Plaintiffs and the Class.

## E.     <u>Adequate Representation</u>.

57.     Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in complex class actions.

58.     Plaintiffs have no interest antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

## F.     <u>Policies And Misconduct Generally Applicable to the Class</u>.

59.     This class action is appropriate for certification because Defendant has acted on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of

15

uniform relief to ensure compatible standards of conduct toward the Class members, and making final injunctive relief appropriate with respect to the Class as a whole.

60.     Defendant's acts challenged herein apply to and affect the Class members uniformly, and Plaintiffs' challenge of these practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

## G.     Superiority.

61.     This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable.

62.     The damages suffered by many of the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions.

63.     Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct absent certification of a class action.

64.     Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint.

65.     By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Economies of our time, effort and expense will be fostered and uniformity of decisions ensured.

## COUNT I

16

## NEGLIGENCE AND/OR RECKLESS INDIFFERENCE

66.     Plaintiffs incorporate by reference all of the foregoing allegations as if set forth herein.

67.     Xerox was negligent, or acted with reckless indifference, in that it failed to use reasonable care when it designed and implemented the MMIS, represented to Alaska that the MMIS was ready to go live when it was not, and when it administered the MMIS.

68.     As the creator of a product with a specific intended known set of users -- Alaska's Medicaid healthcare providers -- Xerox owed a duty to the users to provide a product that would perform as it was intended and expected, and would not cause economic injury to the identifiable and foreseeable users of the product.

69.     Additionally, because of the direct overall impact on Alaska's Medicaid system, Xerox's negligence had (and Xerox knew would likely have) significant consequences to the community including Medicaid patients.

70.     Xerox breached these duties by implementing a product that prevented Class members from receiving timely complete reimbursements to which they were entitled. Among other deficiencies, DHHS has identified the following:

•       The MMIS was unable to accurately balance claims as a result of a rounding error imbedded within the system;

•       The MMIS had extreme slow system performance surrounding medical service authorization functionality;

•       The MMIS improperly priced claims;

•       The MMIS failed to pay certain entire categories of claims;

•       The MMIS inappropriately denied authorized claims;

17

- The MMIS was unable to process many claims, causing those claims to suspend;

- The MMIS listed claims as being paid, but linked no provider to the claim, so checks could not issue and the claims were not in actuality paid; and,

- The MMIS paid the wrong provider.

71.     Xerox's conduct evidenced reckless indifference to the interests of Alaska's Medicaid healthcare providers. Xerox knew that the MMIS was not ready to go live yet represented that it was; and Xerox did so with full knowledge that it was likely to cause serious harm to Alaska's Medicaid providers, but was indifferent to the foreseeable consequences in order to protect its own financial interests.

72.     As a foreseeable direct and proximate result of Xerox's negligence and/or reckless indifference, Plaintiffs and Class members have suffered economic losses in amounts to be determined for excess costs associated with resubmitting valid claims; costs of disputing erroneous denials; lost time value of money for payments that were unreasonably delayed; and costs associated with lost reimbursements caused by the failure to accept claims for filing within one year of the date services were rendered.

73.     No administrative remedy is available to Plaintiffs and other members of the proposed Class for the damages complained of.


## COUNT II

## **BREACH OF CONTRACT**

74.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

18

75. Xerox entered into a contract to develop and implement an MMIS for Alaska.

76. Plaintiffs and other members of the proposed Class were direct, intended third party beneficiaries of the contract entered into between Xerox and Alaska.

77. Xerox breached its contractual obligations to Alaska and, by extension, to Plaintiffs and other members of the proposed Class.

78. The actual and foreseeable result of Xerox's breach of its contractual obligations was the damages suffered by Plaintiffs and other members of the proposed Class, enumerated above, including costs of resubmitting claims, costs associated with delayed receipt of funds, and the permanent loss of reimbursement for legitimate claims that were not accepted by the MMIS within one year of date of service.

79. No administrative remedy is available to Plaintiffs and other members of the proposed Class for the damages complained of.

## COUNT III

### ALASKA UNFAIR TRADE PRACTICE
### AND CONSUMER PROTECTION ACT

80. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

81. The contract through which Xerox agreed to create and implement a new MMIS for Alaska was a contract for the sale of goods and/or services. Xerox was engaged in trade and/or commerce.

82. Xerox's actions complained of herein constitute unfair deceptive acts in the conduct of trade or commerce prohibited by Ak. Stat. § 45.50.471(a). They were unfair, unethical, immoral, and caused substantial injury to businesses.

19

83.     By representing to the State of Alaska that the MMIS was sufficiently operational to "go live" on October 1, 2013, when in fact it was not, Xerox violated Ak. Stat. §45.50.471(b)(6), which prohibits "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  In particular, Xerox represented that the MMIS was usable for the purpose of submitting Medicaid claims for reimbursement, when it was not.

84.     The same communication violates Ak. Stat. § 45.50.471(b)(12), which prescribes:

> using or employing deception, fraud, false pretense, false promise, misrepresentations; or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods.

85.     In its communications with Alaska, Xerox falsely represented that the MMIS was adequately tested or ready to go live when it was not, and concealed the facts that the new system had been inadequately tested, and contained numerous flaws, some already known to Xerox, that precluded it from operating as intended.

86.     Xerox's statements had the capacity to deceive. In fact, Alaska relied on these misrepresentations and omissions, to the detriment of itself and of Plaintiffs and Class members, in permitting the system to go live on October 1, 2013.

87.     Plaintiffs and Class members suffered ascertainable losses of money as a result of Xerox's wrongful acts.

88.     Pursuant to Ak. Stat. § 45.50.531.1, each Class member is entitled to recover three times actual damages suffered, or $500, whichever is greater.

89.     Pursuant to Ak. Stat. § 45.50.537.1, Plaintiffs are entitled to recover costs and full reasonable attorney fees.

20

90.     No administrative remedy is available to Plaintiffs and other members of the proposed Class for the damages complained of.

## VI.     <u>RELIEF REQUESTED.</u>

WHEREFORE, Plaintiffs, individually and on behalf of the Plaintiff Class, pray for the following relief:

a.      An order certifying this matter as a class action with Plaintiffs as Class Representatives, and designating Berger & Montague, P.C. and Ehrhardt & Kelley as Class Counsel;

b.      An award of compensatory, treble and punitive damages for each and every member of the Class;

c.      Pre-judgment and post-judgment interest on monetary relief;

d.      An award of reasonable attorneys' fees and court costs in this action; and/or

e.      All other and further relief as the Court deems necessary, just and proper.

## VII.     <u>JURY DEMAND.</u>

91.     Plaintiffs, individually and on behalf of the Plaintiff Class, demand a jury trial on all issues triable to a jury.

DATED this 23rd day of September, 2015

Respectfully Submitted,

_/s/   Peter R. Ehrhardt, Esquire_____

21

Peter R Ehrhardt, ABA #8006016
Law Offices of Ehrhardt & Kelley
215 Fidalgo Ave. Ste 201
Kenai, AK 99611
Phone: (907)283-2876
Fax: (907)283-2896
peter@mail.kenailaw.com

Sherrie R. Savett, Esq
Peter R. Kahana, Esq
Arthur Stock, Esq
Michael  Twersky, Esq
*Pro Hac Vice pending*
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103
Phone: (215) 875-3000
Fax:    (215) 875-4604
pkahana@bm.net
astock@bm.net
mtwersky@bm.net


ATTORNEYS FOR PLAINTIFFS AND
THE PROPOSED CLASS


KAL/7040186