Peter R. Ehrhardt, Alaska Bar No. 8006016
EHRHARDT & KELLEY
215 Fildalgo Avenue, Suite 201
Kenai, AK 99611
Phone: (907) 283-2876
Fax: (907) 283-2896
peter@mail.kenailaw.com

Sherrie Raiken Savett (pro hac vice)
Arthur Stock (pro hac vice)
Peter R. Kahana (pro hac vice)
Yechiel M. Twersky (pro hac vice)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Phone: (215) 875-3000
Fax: (215) 875-4604
ssavett@bm.net
astock@bm.net
pkahana@bm.net
mitwersky@bm.net

Attorneys for Plaintiffs,
South Peninsula Hospital, Alaska Speech and
Language Clinic, Inc. and Kenai Vision Center,
LLC, On Behalf of Themselves And Others
Similarly Situated

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| South Peninsula Hospital, Alaska Speech and Language Clinic, Inc. and Kenai Vision Center, LLC, on behalf of themselves and others similarly situated, | Case No. 3:15-cv-00177-TMB |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| Xerox State Healthcare LLC, | |
| Defendant. | |

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 1

PLAINTIFFS, on behalf of themselves and others similarly situated, allege, upon personal knowledge as to facts pertaining to themselves and upon information and belief as to facts and conduct of others, as follows:

I.      **NATURE OF THE ACTION**

1.      This class action seeks money damages to compensate Medicaid healthcare providers for financial injuries they suffered because of failure to timely receive reimbursement for their services.  As disclosed by the State of Alaska, the only reason that the reimbursements became delinquent was because the State's newly deployed payment system was developed by Xerox with defects which caused a large percentage of the providers' submitted claims to be either suspended or denied *in error*.

2.      This action only concerns damages flowing from those delayed reimbursements, and does not seek damages for reimbursements which have not yet been paid by the State. Moreover, the delayed reimbursements which were suspended or denied in error have been identified by the State, and the State has authorized payment of those claims without requiring providers to first exhaust potentially applicable administrative remedies to prove that they should never have been suspended or denied in the first instance.

II.     **BACKGROUND**

3.      Plaintiffs, and the class of similarly situated persons or entities they seek to represent in this class action, are all healthcare providers enrolled in Medicaid who submitted claims for reimbursement for Medicaid services from October 1, 2013 to the present using the State of Alaska's Medicaid Management Information System ("MMIS"), the current version of which is referred to as "Health Enterprise".

4.      Health Enterprise pays about $1.5 billion annually to over 22,000 healthcare providers who are mostly in Alaska.

5.      Health Enterprise started up on October 1, 2013 and was designed, developed and implemented by Defendant Xerox State Healthcare ("Xerox") pursuant to a contract with the State.

6.      Health Enterprise was supposed to be designed, developed and implemented by Xerox to correctly perform timely claims processing by causing only one (1) of three (3) possible claim dispositions, each one of which was intended to be controlled by the system's pre-

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 2

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 2 of 28

programmed payment criteria (or, adjudication rules):  namely; either prompt payment of valid claims, prompt denial of invalid claims, or temporary suspense of certain pre-determined types of claims which were known in advance to depend on the system's subsequent receipt of additional data necessary to adjudicate such claims for either payment or denial.

7.     Pursuant to contract performance requirements, ninety percent (90%) of most claims had to be correctly paid or denied by Health Enterprise within thirty (30) days of the date of receipt, and ninety-nine percent (99%) of most claims had to be correctly paid or denied by Health Enterprise within ninety (90) days of the date of receipt.  In addition, to meet these requirements, Health Enterprise was supposed to be designed, developed and implemented by Xerox to process all submitted claims on a weekly reimbursement cycle, with suspended claims being reprocessed each time claims are run until they go into paid or denied status.

8.     As appears more fully below, the State only agreed to the start-up of Health Enterprise on October 1, 2013 because of its reasonable reliance on the intentional and/or negligent misrepresentations and/or nondisclosures of material fact made by Xerox about the readiness of Health Enterprise to process healthcare providers' Medicaid claims without any functionality defects (on that portion of payment system that had been certified by Xerox as being ready for operation).  At the time, the State was led to believe that Health Enterprise was functioning at ninety percent (90%) of all the contractually agreed upon performance requirements, and further, that the remainder of any uncompleted deliverables would be furnished by Xerox with due expedition.

9.     However, Health Enterprise had fundamental and material defects which, upon deployment, caused an immediate and prolonged crisis in the form of backlogged payments of valid reimbursement claims for Plaintiffs and members of the Class that have now amounted to hundreds of millions of dollars in delinquent Medicaid receivables since October 1, 2013.

10.     On September 22, 2014, the State sued Xerox for damages and injunctive relief because of the failed Health Enterprise payment system acknowledging, among other things, how specific material defects that had been identified by the State after October 1, 2013 precluded healthcare providers who submitted valid Medicaid claims from receiving prompt payment--all with devastating consequences to such providers; the relationships between these providers and their patients; the public health, safety and welfare; and of course, the State itself.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 3

11.     The named Plaintiffs, and all or substantially all members of the defined Class, have each had at least one submitted claim (if not numerous others) whose payment was delayed in error for a prolonged period of time in excess of Health Enterprise's required weekly reimbursement cycle as a result of the defective design of Health Enterprise ("backlogged payments").

12.     Backlogged payments fall into one of two categories (the first representing the greatest percentage of the total number of backlogged payments by far):  either valid claims that were subsequently determined by the State to have been erroneously placed into suspense without disposition because of Health Enterprise defects ("suspended claims"), or, valid claims that were subsequently determined by the State to have been erroneously denied because of Health Enterprise defects ("denied claims").

13.     As a result of delayed receipt of their backlogged payments, Plaintiffs, and the Class they represent, seek relief under the Alaska Unfair Trade Practices and Consumer Protection Act (UFTPA), AS 45.50 *et seq*. for statutory damages and under common law negligence for consequential tort damages.

14.     These backlogged payments were all due to material flaws and comprehensive defects in Health Enterprise, as well as Xerox's outrageous assertions and actions regarding the operational readiness of Health Enterprise notwithstanding the fact that these flaws and defects were known or should have been known by Xerox to exist.  Further, Xerox's assertions and actions were made and undertaken in conscious disregard of the uniquely devastating financial harms that Plaintiffs and the Class would foreseeably suffer because of such misconduct.

15.     At minimum, each named Plaintiff, and every Class Member, who eventually received a backlogged payment has been identically injured by the loss of the time value of money because of the delinquent reimbursement of Medicaid services caused by Health Enterprise's faulty functions.

16.     In addition, many, if not substantially all, of the Class Members have likewise incurred other forms of economic loss, including operational costs expended to recover backlogged payments, business injury due to interruption of cash flow (for example, depleting cash reserves to sustain existing operations or diverting funds to expand future operations), and even going out of business.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 4

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 4 of 28

17.     The precise number of all Class members and their names and addresses are unknown to Plaintiffs, but can be ascertained through Health Enterprise and other records maintained by Xerox or the State.  In Health Enterprise, each enrolled provider possesses a unique provider identification number, and each authorized medical facility possesses a unique identification number.  Likewise, each reimbursable service has a unique identifier code.

18.     All or substantially all of the backlogged payments which have caused Plaintiffs and every other similarly-situated healthcare provider to suffer injury in fact in the form of monetary loss have been identified by the State through steps undertaken to fix Health Enterprise, and consequently, such erroneously suspended or denied claims have been or will be paid by the State.

19.     Moreover, the State has made payments for the claims that were improperly denied without any need on the part of Plaintiffs or members of the Class to first resort to Medicaid's administrative appeal process for *denials* in order to prove that those claims, as submitted, were properly payable in accordance with Medicaid standards and procedures.  There is no administrative appeal process to rectify improper *suspensions*.

20.     In sum, the statutory and common law damages sought in this case by Plaintiffs and the Class arise exclusively in connection with valid Medicaid claims already paid by the State, but whose processing was inordinately delayed by technical system failures caused by Xerox's deceptive and outrageous misconduct in designing, developing and prematurely installing Health Enterprise.  In addition, the delayed payments made by the State which represented reimbursement for erroneously suspended claims are not, and never were, remediable by resort to Medicaid's regular administrative appeal process, while the delayed payments which represented reimbursement for erroneously denied claims were paid by the State without first requiring Plaintiffs and the Class to exhaust those administrative remedies.

## III.     PARTIES

### A.     Plaintiffs

21.     South Peninsula Hospital ("South Peninsula") is a non-profit Critical Access Hospital in Homer, Alaska that is enrolled in Medicaid.  It has 22 hospital beds and 28 nursing home beds, and approximately 350 employees.  It bills over $16 million to Medicaid annually.  It is incorporated under the laws of Alaska.  At all material times, this healthcare provider was

known by Xerox as a healthcare provider to be reimbursed for submitted Medicaid claims by means of Health Enterprise.

22. From October 1, 2013 to the present, South Peninsula has received over $10,000,000 worth of backlogged payments from the State that had been originally, but incorrectly, disposed of by Health Enterprise as either suspended or denied claims. Very few, if any of these delayed payments made by the State were as a result of, or in connection with, South Peninsula having filed any type of administrative appeal under Medicaid rules to prove that those claims had been suspended or denied in error.

23. Alaska Speech and Language Clinic, Inc. ("Alaska Speech") is a speech and language pathology provider in Kenai, Alaska that is enrolled in Medicaid. It billed $14,160 to Medicaid between October, 2013 and early 2014. It is incorporated under the laws of Alaska. At all material times, this healthcare provider was known by Xerox as a healthcare provider to be reimbursed for submitted Medicaid claims by means of Health Enterprise.

24. From October 1, 2013 to the present, Alaska Speech has received approximately $13,000 worth of backlogged payments from the State that had been originally, but incorrectly, disposed of by Health Enterprise as either suspended or denied claims. Very few, if any, of these delayed payments made by the State were as a result of, or in connection with, Alaska Speech having filed any type of administrative appeal under Medicaid rules to prove that those claims had been suspended or denied in error.

25. Keeneye Vision Center, LLC ("Keeneye") is an optometry business located in Kenai, Alaska that is enrolled in Medicaid. In 2013 and 2014, it employed two optometrists and several staff members. It billed approximately $150,000 per year to Medicaid, representing about ten percent (10%) of its revenue. It is organized under the laws of Alaska. At all material times, this healthcare provider was known by Xerox as a healthcare provider to be reimbursed for submitted Medicaid claims by means of Health Enterprise.

26. From October 1, 2013 to the present, Keeneye has received over $100,000 worth of backlogged payments from the State that had been originally, but incorrectly, disposed of by Health Enterprise as either suspended or denied claims. Very few, if any of these delayed payments made by the State were as a result of, or in connection with, Keeneye having filed any

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 6

Case 3:15-cv-00177-TMB Document 34 Filed 01/15/16 Page 6 of 28

type of administrative appeal under Medicaid rules to prove that those claims had been suspended or denied in error.

27.     As had been known by Xerox, Health Enterprise was not ready to go live on October 1, 2013.  As a result, South Peninsula, Alaska Speech and Keeneye each had numerous backlogged payments that erroneously deprived them of timely Medicaid reimbursements for many months, causing them to have to fund operations from other sources or go out of business. In addition, to the detriment of other parts of their healthcare businesses, South Peninsula, Alaska Speech and Keeneye were also required to expend supplementary resources in the form of either hiring additional staff or paying overtime to existing employees to troubleshoot why valid claims had become backlogged.

28.     The losses suffered by South Peninsula, Alaska Speech and Keeneye were a foreseeable consequence of Xerox's failures, first, in failing to produce a properly functioning MMIS by October 1, 2013; second, in misrepresenting to the State of Alaska that their system was ready to go live when it was not.

**B.     Defendant**

29.     Defendant, Xerox Healthcare Solutions, LLC, is a limited liability corporation based in Atlanta, Georgia, and incorporated in Delaware.  It is the successor to Affiliated Computer Services State Healthcare, LLC, which entered into a contract to create a new MMIS with the Alaska Department of Health and Social Services.  Xerox has an office in this District at 1835 Bragan Street, Anchorage, Alaska 99508.  It is a subsidiary of Xerox Corporation.

**IV.     JURISDICTON AND VENUE**

30.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), as the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and Class Representatives and most members of the Class are citizens of Alaska, and Defendant is not a citizen of Alaska.  Plaintiff Class consists of greater than 100 members.

31.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this District.

32.     Defendant is subject to personal jurisdiction in this District because it has continuous and systematic contacts, including an office staffed with employees, within this District in Anchorage.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 7

## V.  FACTS

### A.  Medicaid Management Information Systems

33.  Medicaid is a voluntary cooperative health insurance program that provides medically necessary treatment to individuals who cannot otherwise afford medical care.  *See* 42 U.S.C. §§ 1396, *et seq.* It is jointly funded by the federal and state governments and is administered by the states consistent with federal requirements relating to coverage and benefits. 42 U.S.C. §§ 1396a(a), *et seq.*

34.  The Alaska Medicaid program is administered by the Alaska Department of Health and Social Services ("DHSS" or "State"). AS 47.05.010; 7 AAC 100.001, *et seq.*, 7 AAC 105.100, *et seq.* Alaska law grants DHSS, in cooperation with the federal government, broad statutory authority to manage and regulate the state's Medicaid program.

35.  Medicaid Management Information Systems (MMIS) are owned and operated at the state level to process Medicaid claims. These systems are vital for ensuring health services reach Medicaid beneficiaries, payments for those services reach Medicaid providers, and sound management, oversight and reporting take place at the state and federal levels.

36.  Many states have replaced or are in the process of replacing legacy systems no longer capable of meeting the functions required (either in terms of the volume of claims being processed or their complexity).

37.  Alaska's MMIS was established in 1987 to process and pay Medicaid claims.

38.  Currently, the number of Alaskans enrolled in Medicaid assistance programs has grown to more than 140,000. Moreover, Alaska's MMIS pays about $1.5 billion annually in state and federal money to doctors, hospitals and others who care for Medicaid and Denali Kid Care patients.  In 2014 and 2015 alone, Health Enterprise processed over 13 million Medicaid claims.

### B.  Replacement of Alaska's Old Legacy MMIS

39.  In November, 2006, the DHSS issued a Request for Proposals ("RFP") to replace the existing MMIS.  The RFP required that a new system meet state and federal standards to permit timely processing of Medicaid claims from healthcare providers, and to provide prompt payment of authorized claims.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 8

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 8 of 28

40.     Among other things, the new system had to be flexible enough to support a variety of health care delivery systems and capable of processing claims and data from multiple programs and multiple plans.

41.     The new MMIS also needed to be able to process healthcare provider claims for payment for services rendered that were submitted either electronically or on federally approved paper forms.

42.     The Alaska MMIS contract was divided into three (3) phases: (1) design, development, and implementation (DDI) of the new enterprise MMIS; (2) operation of the MMIS, including its data warehouse and decision support system; and (3) turnover over of the MMIS to DHSS or its contractor upon completion of performance.

43.     All three (3) phases were to be fully implemented by June 1, 2010, which was the original start-up (or "go live") deadline for the new MMIS.

44.     The new MMIS also had to be certifiable by the Centers for Medicare and Medicare Services ("CMS"), since CMS (the federal agency responsible for administration of Medicare) provides ninety percent (90%) of the funds for the design, development and implementation of the MMIS, and seventy-five percent (75%) of the funds for the operation of the MMIS once it has been certified.

45.     The RFP made clear that the one purpose of the contract was to benefit healthcare providers.  For example, the RFP § 5.6.9 stated:

> The Claims Payment function includes those functions necessary to ensure that payments to providers are accurately and appropriately rendered.

46.     Similarly, § 5.6.9.3.2, subtitled "Contractor Responsibilities – Weekly Checkwrite Processing," required that the MMIS:

> (1)  Generate payment amounts and process payments made through reimbursable service agreements (RSAs).  Make payments to other programs without issuing EFT transactions or hard copy warrants.
>
> (2)  Process a payment cycle no less than weekly that includes processing of all claims and financial transactions.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 9

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 9 of 28

47.     § 5.6.9.3.4, "Contractor Responsibility – EFT Processing," required that the MMIS:

> (1)   Produce electronic fund transfer payments for those providers requesting EFT . . .

48.     In 2007, DHSS awarded the contract to design, develop, implement and operate the new MMIS to Affiliated Computer Services State Healthcare, LLC (ACS). § A.13 of the contract expressly states that ACS is an independent contractor for the state and that no agency relationship was created or is maintained between Alaska and ACS.

49.     Xerox subsequently acquired ACS, and in so doing acquired and assumed all of ACS's interests, responsibilities and obligations as an independent contractor relative to the new MMIS contract.

50.     ACS was aware at the time it entered this MMIS contract, and Xerox at all subsequent times, that one purpose of the new MMIS contract was to permit healthcare providers in Alaska to receive prompt and accurate reimbursement from Medicaid.  Conversely, ACS and Xerox were aware that a failure to deliver a properly functioning product would injure the affected healthcare providers by, *inter alia*, depriving them of money they had earned.

51.     The contract made clear that Xerox was required to meet an appropriate standard of care in its work on the contract:

### C.3     Standard of Care

> When providing Deliverables and performing Services pursuant to this Agreement, the Contractor shall, and shall cause the Contractor Agents to, provide such Deliverables and perform such Services in a professional manner and in a way that meets or exceeds the Contractor Standard of Care. As used herein, the term "**Contractor Standard of Care**" means the exercise of degree of skill, diligence and prudence which is expected from a skilled, experienced and nationally recognized and reputed contractor engaged in the same type of undertaking under similar circumstances and acting generally in accordance with applicable laws, rules, regulations, codes and industry standards.

52.     These provisions of the RFP cited above, and many others specifying the manner in which the MMIS would serve the needs of healthcare providers, were incorporated into the contract that Xerox had legally assumed.  *See* Contract § G.2.1:

The contractor shall design, develop, integrate, install, test, deploy, maintain and operate the Alaska MMIS that will meet all the functional and operational requirements described in the RFP.

### C.    Delays By Xerox In Providing Acceptable DDI Deliverables

53.    Xerox did not meet the June 1, 2010 "go live" deadline for all three (3) phases of the work required under the new MMSI contract. Even worse, at present (which is more than nine (9) years from contract inception), Xerox has yet to still provide a fully implemented, functional, and certifiable system in accordance with the contract requirements.

54.    From the outset, Xerox's performance was marred by missed deadlines and false representations regarding the operational readiness of the new Heath Enterprise system.

55.    After the State had agreed to numerous additional extensions of the "go live" deadline as requested by Xerox, the State finally agreed to allow Xerox to "go-live" with Health Enterprise on October 1, 2013.

56.    That is because Xerox had represented to the State in September of 2013 that it performed extensive "system testing" on the MMIS, allegedly running over 13,000 test cases to confirm that the system met the essential requirements necessary to "go live"; and further, that approximately 90% of the system's functionality would be implemented.  In regard thereto, Xerox had submitted a certification (known as "an operational readiness document") to DHHS in September of 2013 stating that the MMIS was ready to be implemented.

57.    The State did not give its acceptance of the MMIS. Rather, acceptance by the State was withheld because of the limited number of then-known defects in the system which Xerox had agreed to fix in short order and because of there being other parts of the system whose development and implementation were deferred.

58.    Based on the false representations by Xerox, the new MMIS "went live" on October 1, 2013.  From that date, electronic and paper claims could be submitted only through that system and not through the previous MMIS.  There was no opportunity for healthcare providers to receive Medicaid reimbursement by any other means other than through the Xerox developed and operated MMIS.

### D.    "Go Live" Medicaid Payment Crisis

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 11

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 11 of 28

59.     Plaintiffs, members of the Class and the State immediately became aware that the Health Enterprise system was fundamentally flawed, and was not able to perform the functions required to facilitate payments to healthcare providers.  Providers who submitted claims by direct computer input or by paper documentation found that few, if any, claims were being accepted for processing by the system and that they were not receiving timely reimbursements in comparison to their pre-conversion levels of reimbursement under the old, legacy MMIS.  This caused immediate financial hardship for many providers as the number of backlogged payments soon ballooned into a prolonged crisis of overdue Medicaid accounts receivables.  The impact on providers continued to increase exponentially for at least a year and a half, until many of the system's defects were subsequently identified and fixed by the State.  But even today, certain providers are still being adversely impacted by their delayed receipt of backlogged payments.

60.     An inspection of the Xerox mail room by Alaska in 2014 revealed that hundreds of thousands of claims submitted on paper, typically by smaller providers, were being held in stacks and had not been processed at all.  Xerox responded to a complaint by the State by returning many of the claims to the providers, rather than processing them, exacerbating the delays and the financial damage experienced by the providers who had submitted these claims.

61.     Hundreds of thousands of electronic claims were also, in effect, left in stacks unopened by being improperly put into suspense status by Health Enterprise, and thus, neither paid nor denied for extended periods.  The effect on providers was the same as with the unprocessed paper claims:  reimbursements were not received, causing financial hardship.

62.     For at least a year and a half, the pattern of continuous suspensions or denials of valid claims by Xerox's MMIS required providers to resubmit each claim, a tedious process involving reposting data that had already been inputted into a computer or re-submitting previously submitted paper documentation.  Unfortunately, re-inputting data or re-submitting previously submitted paper documentation takes extensive time, and typically had to be done between 4 and 7 times before a legitimate claim was finally accepted for disposition and eventually paid.  The additional workload of having to identify problems connected with receivables outside Medicaid's weekly payment cycle increased the providers' costs for administrative support significantly.  Some providers paid employees overtime, others hired

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 12

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 12 of 28

additional staff and others reallocated personnel who had other responsibilities apart from billing.

63.     In many cases, Medicaid claims submitted electronically were not even registered on the MMIS as having been received at all.  This created a risk that the claim would never be paid at all, because applicable regulations permit reimbursement of claims only if they are received within one year of the date of service.  Thus, healthcare providers had no choice but to continuously try and resubmit these claims.

64.     Because of the widespread performance problems of Health Enterprise upon its deployment, the State has endeavored to partly ameliorate some of the financial hardships that providers have suffered by offering interest-free loans.

65.     Loans of over $160 million were extended to Alaska healthcare providers in late 2013 and 2014.  While these loans have provided temporary compensation for lost revenue from Medicaid, they do not reimburse any other expenses incurred by providers who have elected to take these loans.  These loans also account for only approximately ten percent (10%) of the estimated $ 1.5 billion that Health Enterprise is supposed to properly pay out on an annual basis.

**E.      DHSS Files Suit Against Xerox**

66.     On September 22, 2014, Alaska's DHSS filed a claim against Xerox with the Commissioner of the Department of Administration (COA) in accordance with the contract between the State and Xerox to design, develop, implement and operate Health Enterprise.  *See* Exhibit 1, Statement of Claim, *In the Matter of  Department of Health and Social Services v. Xerox State Healthcare (f/k/a ACS State Healthcare, LLC)*, before the COA, Contract 060706 RFP 2007-0600-6640.

67.     Among other things, DHSS's claim seeks specific performance, declaratory relief, injunctive relief and damages as a result of "Xerox's defective MMIS and its failure to remedy the defects…[which] have rendered Xerox incapable of adequately processing claims in accordance with the contract."  Exhibit 1,  p.8-9, at para. 28.

68.     DHSS further states in its claim that Xerox's defective MMIS "has rendered healthcare providers that submit claims incapable of receiving payment…." Exhibit 1, p.9, at para. 29.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 13

69.     DHSS had determined through investigation "that due to Xerox's defective programming an unknown percentage of claims submitted [electronically] using the new MMIS are artificially placed by Xerox in a 'suspended' status", meaning that "due to defects in the MMIS, such claims are treated as neither paid nor denied." Exhibit 1, p.9, at para. 30. As of July 29, 2014, DHSS had identified at least 89,421 such claims. Exhibit 1, p.10, at para. 32.

70.     On February 2, 2015, Margaret Brodie, the Director of the Division of Health Care Services (DHCS) for the DHSS since June 2012, submitted an Affidavit in support of the State's COA claim, in which she enumerated specific defects in Health Enterprise that arose from Xerox's failure to fully test certain performance deliverables during the DDI phase of the contract. *See* Exhibit 2, Affidavit of Margaret Brodie, OAH No. 14-16-CON Agency No. 060706. These specific defects included:

   • "Extreme slow system performance surrounding medical service authorization functionality";

   • "System fails to pay certain categories of claims….";

   • "System inappropriately denies claims (many remain wrongly denied and outstanding for over a year)";

   • "System is unable to process many claims, causing the claims to suspend";

   • "System lists claims as being paid, but links no provider to the claim, so checks can't issue and the claims aren't paid"; and,

    • "System pays wrong provider (also problematic because the checks go to the wrong provider with an EOB ["Explanation of Benefits"]—this is protected health information").

*See* Exhibit 2, p. 4-5, at para. 7.

71.     The same Affidavit also states that the State began tracking the amount of time its staff spent due to defects caused by Health Enterprise since it went live; and further, that the State calculated those costs at $4.5 million as February of 2015. Exhibit 2, p.6, at para. 11. In addition, the Affidavit states that 18 providers have gone out of business even after taking interest-free loans. Exhibit 2, p.7-8, at para. 13.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 14

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 14 of 28

72.     On May 11, 2015, Ms. Brodie provided Alaska's House Finance Committee a "Medicaid Payment System Status Update" that showed, among other things, that many of the problems with Health Enterprise that were outlined in her February 2015 Affidavit "have been corrected or significantly improved." *See* Exhibit 3, "Medicaid Payment System Status Update" dated May 11, 2015, p.12.

73.     However, Ms. Brodie's "Medicaid Payment System Status Update" reiterated as part of the "Background" section of her report to the House Finance Committee how, beginning with its deployment on October 1, 2013, "[t]he new system had significant performance problems; *many claims suspended or denied in error, causing providers to experience serious difficulties getting paid*." Exhibit 3, p.2 (emphasis added).

74.     The "Medicaid Payment System Status Update" contains astonishing data indicating that in January 2014 at the height of the system's defectiveness over 60% of all claims were placed in suspended status. Exhibit 3, p.10.

75.     This astounding percentage of suspensions should not happen. Properly suspended claims should be limited to claims that require manual review, such as claims that require medical necessity justification, or durable medical equipment claims. Exhibit 3, p.16. As of May 2015 *only* about 9% of *new* claims are suspending. This is a significant reduction from the 60% that were suspending under the flawed system.

76.     Another hand-out exhibit utilized by Ms. Brodie before the House Finance Committee on May 11, 2015 similarly explains how:

• Providers' submitted Medicaid claims can be paid, denied or suspended "correctly or in error" (Exhibit 4, p.3);

• "To be considered timely-processed, 90 percent of most claims must be paid or denied within 30 days of the date of receipt [and] [n]inety-nine percent of most claims must be paid or denied within 90 days of the date of receipt" (Exhibit 4, p.3);

• "[L]arge numbers of claims were either suspended or denied in error [because of widespread performance problems with the new system]" (Exhibit 4, p.1);

• "Of 17,000 defects identified [since deployment on October 1, 2013], fewer than 100 remain [as of March of 2015]" (Exhibit 4, p.4);

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 15

• "Ninety percent of new claims are processing correctly [as of March of 2015]" (Exhibit 4, p.4); and,

• "Xerox is working through a backlog of incorrectly suspended claims that developed when the system was deployed in October 2013" (Exhibit 4, p.3).

*See* Exhibit 4, May 11, 2015, Alaska Department of Health and Social Services, "Medicaid Claims Payment system: Background and Status".

77.     Significantly, and in connection with the DHHS suit against Xerox, Xerox has instituted a Corrective Action Plan "for resolving all major defects" (*see* Exhibit 4, p.4), which includes a plan for remediating the "Operational Backlog" created by the faulty MMIS system via eliminating the significant suspended claims backlog, and retrospective mass claims adjustments. However, this plan did not remediate providers for the time value of money, or for the other economic losses that are the subject of this Complaint.

### F.     **The Class Representatives' Experiences**

#### 1.     **South Peninsula Hospital**

78.     South Peninsula, a not-for-profit corporation, is the principal hospital serving Homer and the surrounding region. It has been designated a Critical Access Hospital because it is a small hospital and the only provider of emergency services in its region. It has an annual budget of about $58 million, and historically about twenty-eight percent (28%) of its revenue has come from Medicaid reimbursements.

79.     Prior to the 2013 conversion to the new MMIS, South Peninsula had submitted Medicaid claims electronically on a daily basis. It would receive reimbursements on a weekly basis. If any claims were found to be inadequately documented, the reasons they were not accepted would be listed in a document provided weekly to the Hospital, which is called a "remittance advice." Any issues raised on the remittance advice would be addressed by the Hospital in a prompt refiling. Typically, a weekly remittance advice would be about 50 pages. In addition, prior to October 2013, it generally received payment on the vast majority of its submitted claims within 120 days.

80.     Beginning in October 2013, weekly remittance advice memos grew from 50 to 500 pages and virtually no claims were deemed to be acceptable in the first claim submission. Almost all claims were neither accepted nor denied, but instead either suspended or simply left

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 16

unacknowledged by Health Enterprise.  Moreover, the remittance advice documents were unusable, often requesting additional information that was not legally required or did not exist. Frequently, information about patients being treated at other hospitals in Alaska was erroneously included in the remittance advices sent to South Peninsula.

81.     In the first full year of MMIS operations, very few, if any, reimbursements were made to South Peninsula for MRI procedures.  Many other categories of claims were also delayed for many months.

82.     Additionally, after the new MMIS commenced operating, Medicaid began for no apparent reason "taking back" (by offsets to amounts due) claims funds that had been legitimately paid in 2010, 2011, 2012 and 2013, with no explanation.

83.     The only means of obtaining reimbursement for legitimate claims was to repeatedly resubmit these same claims.  Unfortunately, the resubmissions took time and money. South Peninsula paid for 971 hours of overtime for clerical employees in the past two years in order to resubmit claims that in most cases had already been properly submitted for a cost of $46,371.  On average, each rejected claim required between 4 and 7 resubmissions before it would be accepted.

84.     In addition to overtime, employees of South Peninsula put in in extra hours on the resubmission of Medicaid claims during their regular hours, limiting their ability to perform other necessary functions, such as billing to insurance companies for privately insured patients. Two full-time employees who had previously had other duties were transferred to work on Medicaid submissions for total salary and benefit expenses of $108,000 in each of two years.

85.     The redeployment of staff also resulted in a decline in the ability to timely bill insurance companies, which led to an increase in accounts receivable over 120 days from $600,000 in October 2013 to over $1,200,000 two years later in commercial accounts.

86.     From October 1, 2013 to the present, South Peninsula has received over $10,000,000 worth of backlogged payments from the State that had been originally, but incorrectly, disposed of by Health Enterprise as either suspended or denied claims.  At least $1 million of Medicaid claims from 2013 and early 2014 have still not been paid.

## 2.    Alaska Speech and Language Clinic, Inc.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 17

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 17 of 28

87. Alaska Speech and Language Clinic, Inc. is a speech and language pathology practice with a single provider, Annette O'Connell. Almost all of its business consisted of Medicaid-eligible clients. Alaska Speech submitted claims for reimbursement on paper rather than through a computer system. Prior to October 2013, it generally received payment within 60 days.

88. Reimbursements stopped in October 2013. Initially, Alaska Speech did not receive error codes, notices of either acceptance or denial of claims, or any other communications from Xerox or Alaska. After repeated requests to Xerox, Alaska Speech was told that many of its claims had been paid, when in fact they had not been. Resolving these issues required a significant amount of administrative time for Alaska Speech's part-time office manager, costing Alaska Speech a significant amount of additional expense resulting from the defective MMIS.

89. Between October 2013, and January 2014, Alaska Speech submitted claims for $14,160 in reimbursement. It received no payments until March 2014, although it did receive a loan of $14,160 from Alaska on January 7, 2014. Between March and May 2014, Alaska Speech received $13,215 worth of backlogged payments from the State that had been originally, but incorrectly, disposed of by Health Enterprise as either suspended or denied claims.

90. Because of the absence of cash flow and the uncertainty of when Medicaid reimbursement would resume, Alaska Speech was forced to substantially curtail its operations in 2014.

### 3. Keeneye Vision Center, LLC

91. Keeneye Vision Center, LLC, was, through the end of 2014, an optometric practice with two optometrists. It had submitted Medicaid claims electronically, through a claims processor, Fusion. In September, 2013, Keeneye received a notification that the new MMIS would begin operation on October 1, 2013. Keeneye's office manager had regularly accessed the MMIS to keep track of claims and accounts receivable.

92. On October 4, 2013, the office manager discovered that it was not possible to log into the MMIS. Attempts to address the problem with Xerox by telephone were unsuccessful. Only after three weeks did Keeneye discover that the MMIS was accessible only through

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 18

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 18 of 28

computers that used an older version of the Internet Explorer web browser – information which Xerox had not provided.

93.    Keeneye then was able to access "Explanation of Benefits" documents, and discovered that the documents were provided in an unreadable format. Dollar values listed for claims accepted, suspended, and rejected could not be reconciled with invoices that had been submitted. It appeared that a systematic rounding error resulted in Keeneye receiving small amounts less than was proper on almost every claim. An inexplicable return to reimbursement rates from a previous year for eyeglasses, caused a larger shortfall. Virtually all payments were significantly delayed, although most were not denied. Keeneye received less than $2,500 in payments between October 1 and December 2013, a period in which it submitted $33,000 in claims. After payments totaling $18,302 were received on December 23 and 30, 2013, a shortfall of almost $15,000 remained, some of which has not yet been recovered.

94.    Throughout 2014, Xerox suspended all claims for eye examinations for Medicare-eligible patients on the basis that they should have been submitted to Medicare, not Medicaid. This was a senseless requirement, since Medicare does not cover eye examinations and such claims are routinely, and correctly, rejected. However, the requirement to submit to Medicare, and then submit to Medicaid only after being rejected, added months to the payment cycle.

95.    The MMIS failures required Keeneye's office manager to spend over 200 hours troubleshooting in the last quarter of 2013, and required about two extra days of bookkeeping and account reconciliation work per month through the end of 2014.

96.    From October 1, 2013 to the present, Keeneye has received over $100,000 worth of backlogged payments from the State that had been originally, but incorrectly, disposed of by Health Enterprise as either suspended or denied claims. At this time, over $3,000 in legitimate claims for 2013 and 2014 have not yet been reimbursed.

VI.    **CLASS ACTION ALLEGATIONS**

A.    **Absence of Administrative Remedies**

97.    The claims that are the subject of this suit are either valid claims that were subsequently determined by the State to have been erroneously placed into suspense without disposition because of Health Enterprise defects, or, valid claims that were subsequently

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 19

determined by the State to have been erroneously denied because of Health Enterprise defects. They are not isolated mishandled claims that were or will be subject to administrative remedy.

98.     In fact, as for the suspended claims, or non-acknowledged claims, no administrative remedies were or are even available to Plaintiffs and Class Members who have been damaged, because they have no recourse to obtain any recovery through an administrative process.  The Alaska Administrative Code provides two levels of appeals for "a denied or reduced claim."  7 Alaska Admin. Code § 105.270(a); *see also* 7 Alaska Admin. Code § 105.280 (second level of appeals where relief was denied under § 105.270).  Claims submitted by Plaintiffs that were suspended by the flawed MMIS were neither reduced nor denied and therefore cannot be appealed.

99.     This point is reiterated in the "Institutional Claims Management" guidelines prepared by Xerox, which specifically note that "No action is required by the provider while a claim is pended…."  *See* Exhibit 5, p.25.  "Section II: Institutional Claims Management".

100.    As for claims that were wrongly denied on account of the faulty MMIS, as made clear by the DHSS in its filed COA claim, and the Brodie documents (Exhibits 2-4), the State identified and reprocessed these claims without resort to administrative appeals.

101.    Moreover, recompense for the injuries complained of here is unavailable through the administrative process, even where claims were formally denied.  The only administrative remedy available is payment of the amount of the claim that had been reduced or denied.  There is no opportunity to present administrative claims for either costs incurred due to delay in receiving funds, costs associated with resubmitting claims or filing appeals of claims, or for obtaining statutory damages provided for in the Alaska Unfair Trade Practice and Consumer Protection Act.  These are the exclusive bases for recovery sought in this case.

**B.     Class Definition**

102.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), (b)(3) and/or (c)(4) on behalf of themselves and the following class defined as follows (the "Class"):

> All Alaska-enrolled Medicaid healthcare providers who submitted a claim for reimbursement from October 1, 2013 to the present whose payment was identified  by the State as having been suspended or denied

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 20

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 20 of 28

in error by the State's Medicaid Management Information System, and was subsequently paid by the State.

103.    The following individuals are excluded from the Class: (1) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and its current or former employees, officers and directors; (2) persons who properly execute and file a timely request for exclusion from the Class; (3) the legal representatives, successors or assigns of any such excluded persons; and (4) persons whose claims against Defendant have been fully and finally adjudicated and/or released.

104.    Plaintiffs reserve the right to expand the Class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

105.    Plaintiffs limit the definition of the Class as required by the applicable statute of limitations and accrual of statute of limitations as determined by the Court.

106.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

C.    **Numerosity**

107.    The members of the proposed Class are so numerous that joinder of all members in one action is impracticable. While the precise number, names and addresses of all Class members are unknown to Plaintiffs at this time, such information can be ascertained from records maintained by Defendant (and Health Enterprise). The Class is reasonably estimated to be at least in the thousands.

108.    According to a schedule provided by the State of Alaska, there are approximately 22,000 healthcare providers enrolled in Medicaid who are required to submit claims through Health Enterprise in order to receive compensation for providing Medicaid services. Upon information and belief, the vast majority enrollees are located in Alaska, although there may be many hundreds also located in the "Lower 48".

D.    **Commonality**

109.    The claims of Plaintiffs and the Class have a common origin and share a common basis. All Class members suffered from the same misconduct complained of herein, and they all suffered injury as a result of the violations of Alaska's UFTPA and breaches of duties of care

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 21

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 21 of 28

that form the basis of this lawsuit and that are supported by common proof. Common questions of law and fact exist as to all members of the putative Class, including, but not limited to the following:

a.  Whether the MMIS designed and developed by Xerox was defective upon deployment, in that this new payment system was immediately discovered by DHSS to incorrectly suspend or deny large percentages of properly submitted valid claims;

b.  Whether Xerox misrepresented to DHSS that Health Enterprise was ready to operate as of October 1, 2013;

c.  Whether statements by Xerox about the readiness of Health Enterprise to handle healthcare providers' Medicaid claims without any functionality defects as of October 1, 2013 were intentional and/or negligent misrepresentations and/or nondisclosures of material fact;

d.  Whether Xerox's actions complained of herein constitute unfair deceptive acts in the conduct of trade or commerce prohibited by Alaska's UFTPA;

e.  Whether DHSS reasonably relied on the intentional and/or negligent misrepresentations and/or nondisclosures of material fact made by Xerox about the readiness of Health Enterprise to handle healthcare providers' Medicaid claims without any functionality defects;

f.  Whether Plaintiffs and the Class suffered ascertainable losses of money because of the delinquent reimbursement of Medicaid services caused by Health Enterprise's backlogged payments;

g.  Whether the defects of the MMIS caused consequential business-type harms to Plaintiffs and the Class as described in Paragraphs 16, 83-85, 88-90, and 95 above;

h.  Whether Xerox owed a duty of care to healthcare providers;

i.  Whether the healthcare providers enrolled in Health Enterprise constitute a group of professional businesses for which it was particularly foreseeable that they were likely to be injured as a result of the defective MMIS developed and implemented by Xerox;

j.  Whether the defective MMIS breached a duty of care Xerox owed to healthcare providers enrolled in Health Enterprise;

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 22

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 22 of 28

k.  Whether members of the Class are entitled to recover monetary damages caused by Xerox's actions; and

l.  Whether members of the Class are entitled to recover punitive damages as a result of Xerox's actions.

**E.      Typicality**

110.    Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and all other members of the Class were harmed by Defendant's wrongful conduct. Defendant's conduct giving rise to the claims is identical as to all members of the Class and the losses Plaintiffs have suffered uniformly were all caused by Defendant's Class-wide violations of Alaska's UFTPA and breaches of duty of care in designing, developing and implementing Health Enterprise.

111.    All, or substantially all, of the Class members were injured by Xerox's conduct inasmuch as all, or substantially all, of them were deprived of one or more timely reimbursements caused by Health Enterprise's erroneous suspension or denial of submitted claims.  All, or substantially all, of the Class members were likewise injured by additional costs and/or uncompensated workload incurred in having to first identify, and then reasonably attempt to mitigate problems caused by, these backlogged payments.

**F.      Adequacy**

112.    Plaintiffs and the other Class members are aggrieved by Defendant's prohibited transactions and breaches of duty, and Plaintiffs are intent on seeing such wrongs remedied. Plaintiffs are therefore committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the Class, and have retained counsel competent and experienced in class action litigation of this nature for this purpose. Neither Plaintiffs nor their counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this class action. In addition, Defendant has no defenses unique to Plaintiffs. Thus, Plaintiffs are adequate representatives of the Class.

**G.      Predominance**

113.    Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issue of

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 23

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 23 of 28

significance will be the exact amount of losses recovered by each Class member, the calculation of which can determined through administrative proceedings which do not bar certification.

### H. Superiority

114.    A class action is superior to all other feasible alternatives for the resolution of this matter, especially given that joinder of all parties is impracticable.

115.    The damages suffered by many of the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions.

116.    Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct absent certification of a class action.

117.    Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. Individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

118.    Furthermore, neither Plaintiffs nor Xerox are aware of any ongoing litigation involving Class members over damages they incurred as a result of Xerox's misconduct.  Indeed, given the applicable statutes of limitations, it is equally unlikely that any other action will ever be brought.  Plaintiffs' lawsuit was originally filed in this Court on September 24, 2015, almost two years to the date that Health Enterprise was deployed on October 1, 2013.

119.    Plaintiffs do not anticipate any difficulty in the management of this action as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide the Class into further subclasses.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 24

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 24 of 28

## VII.    CLAIMS FOR RELIEF

### COUNT I

### ALASKA UNFAIR TRADE PRACTICE
### AND CONSUMER PROTECTION ACT

120.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

121.    The contract through which Xerox agreed to create and implement a new MMIS for Alaska was a contract for the sale of goods and/or services. Xerox was engaged in trade and/or commerce.

122.    Xerox's actions complained of herein constitute unfair deceptive acts in the conduct of trade or commerce prohibited by Alaska's UFTPA, Ak. Stat. § 45.50.471(a). They were unfair, unethical, immoral, and caused substantial injury to businesses.

123.    By representing to the State of Alaska that the MMIS was sufficiently operational to "go live" on October 1, 2013, when in fact it was not, Xerox violated Ak. Stat. §45.50.471(b)(6), which prohibits "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  In particular, Xerox represented that the MMIS was usable for the purpose of submitting Medicaid claims for reimbursement, when it was not.

124.    The same communication violates Ak. Stat. § 45.50.471(b)(12), which prescribes:

> using or employing deception, fraud, false pretense, false promise, misrepresentations; or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods.

125.    In its communications with Alaska, Xerox falsely represented that the MMIS was adequately tested or ready to go live when it was not, and concealed the facts that the new system had been inadequately tested, and contained numerous flaws, some already known to Xerox, that precluded it from operating as intended.

126.    Xerox's statements had the capacity to deceive. In fact, Alaska relied on these misrepresentations and omissions, to the detriment of itself and of Plaintiffs and Class members, in permitting the system to go live on October 1, 2013.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 25

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 25 of 28

127.    Plaintiffs and Class members suffered ascertainable losses of money as a result of Xerox's wrongful acts.

128.    Pursuant to Ak. Stat. § 45.50.531.1, each Class member is entitled to recover three times actual-damages suffered, or $500 per unlawful act, whichever is greater.

129.    Pursuant to Ak. Stat. § 45.50.537.1, Plaintiffs are entitled to recover costs and full reasonable attorney fees.

**COUNT II**

**<u>NEGLIGENCE AND/OR RECKLESS INDIFFERENCE</u>**

130.    Plaintiffs incorporate by reference all of the foregoing allegations as if set forth herein.

131.    Xerox was negligent, or acted with reckless indifference, in that it failed to use reasonable care when it designed and implemented the MMIS, represented to Alaska that the MMIS was ready to go live when it was not.

132.    As the creator of a product with a specific intended known set of users -- Alaska's Medicaid healthcare providers -- Xerox owed a duty to the users to provide a product that would perform as it was intended and expected, and would not cause economic injury to the identifiable and foreseeable users of the product.

133.    Additionally, because of the direct overall impact on Alaska's Medicaid system, Xerox's negligence had (and Xerox knew would likely have) significant consequences to the community including Medicaid patients.

134.    Xerox breached these duties by implementing a product that prevented Class members from receiving timely complete reimbursements to which they were entitled. Among other deficiencies, DHHS has identified the following:

- The MMIS was unable to accurately balance claims as a result of a rounding error imbedded within the system;

- The MMIS had extreme slow system performance surrounding medical service authorization functionality;

- The MMIS improperly priced claims;

- The MMIS failed to pay certain entire categories of claims;

- The MMIS inappropriately denied authorized claims;

- The MMIS was unable to process many claims, causing those claims to suspend;

- The MMIS listed claims as being paid, but linked no provider to the claim, so checks could not issue and the claims were not in actuality paid; and,

- The MMIS paid the wrong provider.

135. Xerox's conduct evidenced reckless indifference to the interests of Alaska's Medicaid healthcare providers. Xerox knew that the MMIS was not ready to go live yet represented that it was; and Xerox did so with full knowledge that it was likely to cause serious harm to Alaska's Medicaid providers, but was indifferent to the foreseeable consequences in order to protect its own financial interests.

136. As a foreseeable direct and proximate result of Xerox's negligence and/or reckless indifference, Plaintiffs and Class members have suffered economic losses in amounts to be determined for excess costs associated with resubmitting valid claims; costs of disputing erroneous denials; and lost time value of money for payments that were unreasonably delayed.

## VIII. **RELIEF REQUESTED**

WHEREFORE, Plaintiffs, individually and on behalf of the Plaintiff Class, pray for the following relief:

a.     An order certifying this matter as a class action with Plaintiffs as Class Representatives, and designating Berger & Montague, P.C. and Ehrhardt & Kelley as Class Counsel;

b.     An award of compensatory, treble and punitive damages for each and every member of the Class;

c.     Pre-judgment and post-judgment interest on monetary relief;

d.     An award of reasonable attorneys' fees and court costs in this action; and/or

e.     All other and further relief as the Court deems necessary, just and proper.

*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 27

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 27 of 28

## IX.  JURY DEMAND

137.  Plaintiffs, individually and on behalf of the Plaintiff Class, demand a jury trial on all issues triable to a jury.


Dated: January 15, 2016                    Respectfully Submitted,


/s/ Peter R. Ehrhardt_____
Peter R. Ehrhardt
Ehrhardt & Kelley
215 Fidalgo Avenue
Suite 201
Kenai, AK  99611
Phone: (907) 283-2876
Fax:    (907) 283-2896
peter@mail.kenailaw.com

and

Sherrie R. Savett
Peter R. Kahana
Arthur Stock
Y. Michael  Twersky
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103
Phone: (215) 875-3000
Fax:    (215) 875-4604
ssavett@bm.net
pkahana@bm.net
astock@bm.net
mtwersky@bm.net


ATTORNEYS FOR PLAINTIFFS AND
THE PROPOSED CLASS


*South Peninsula Hospital, et al. v. Xerox State Healthcare LLC*, Case No. 3:15-cv-00177-TMB
**FIRST AMENDED COMPLAINT** – Page 28

Case 3:15-cv-00177-TMB   Document 34   Filed 01/15/16   Page 28 of 28